**LEE'S AQUARIUM & PET PRODUCTS, INC., Plaintiff,**

v.

**PYTHON PET PRODUCTS, INC., Defendant.**

**PYTHON PRODUCTS, INC., Counter-claimant,**

v.

**LEE'S AQUARIUM & PET PRODUCTS, INC., and Lee Schultz, Counter–Defendants.**

No. Civil 96–0383–B (JFS).

United States District Court, S.D. California.

Feb. 5, 1997.

John J. Murphey, T. Steven Gregor, Murphey Law Offices, Carlsbad, CA, for plaintiff.

James R. Cole of Quarles & Brady, Madison, WI, Callie A. Bjurstrom of Luce, Forward, Hamilton & Scripps, San Diego, CA, for defendants.

**ORDER AND JUDGMENT: (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT; (2) DENYING COUNTER–CLAIMANT'S MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT; (3) DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION OF INVALIDITY; (4) DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION OF EQUITABLE ESTOPPEL; (5) GRANTING COUNTER–CLAIMANT'S MOTION FOR SUMMARY ADJUDICATION ON EQUITABLE ESTOPPEL CLAIM FINDING NO EQUITABLE ESTOPPEL; AND (6) DISMISSING BY STIPULATION COUNTER–CLAIMANT'S CLAIMS FOR UNFAIR COMPETITION and BUSINESS DISPARAGEMENT**

BREWSTER, District Judge.

On Friday, January 31, 1997, the above-captioned matter came on regularly for hearing upon cross-motions for summary judgment. After due consideration of the moving and opposition papers and the arguments of counsel at hearing, the Court hereby;

(1) GRANTS Plaintiff's Motion for Summary Judgment of Non-infringement;

(2) DENIES Counter-claimant's Motion for Summary Judgment of Infringement;

(3) DENIES Plaintiff's Motion for Summary Adjudication of Invalidity;

(4) DENIES Plaintiff's Motion for Summary Adjudication of Equitable Estoppel;

(5) GRANTS Counter-claimant's Motion for Summary Adjudication on Equitable Estoppel claim finding no Equitable Estoppel and;

(6) DISMISSES BY STIPULATION Counter-claimant's Claims for Unfair Competition and Business Disparagement.

## I. BACKGROUND

On March 1, 1996, Plaintiff filed a suit seeking declaratory judgment of non-infringement and patent invalidity against Python with respect to Python's U.S. Patent No. 4,610,784 ('784 Patent). Python filed an answer and counterclaim, alleging that LAPP's product (the Ultimate Gravel Vac or "UGV")[1] infringed on the '784 patent, literally and under the doctrine of equivalents. Plaintiff's complaint was amended adding a cause of action for Equitable Estoppel against Python. Defendant's counterclaim was also amended adding causes of action against LAPP and its owner Lee Schultz for unfair competition, unfair trade practice, unfair competitive practices under the Lanham Act, 15 U.S.C. § 1125(a), and business disparagement under the Lanham Act.

The claims of Python's '784 patent and LAPP's Ultimate Gravel Vac will be discussed in detail below, however, a brief background on the products will aid in better understanding the issues at hand. The '784 patent claims a device that is used for clean-

---

1. When first introduced, LAPP's product was known as "Safe & Easy." The product has not been changed, and all references to UGV are intended to include the Safe & Easy product.

ing and filling fish aquariums. Python claims a faucet pump that connects at one end to the faucet and at the other end to a flexible hose. The hose is then connected to a wider clear plastic gravel tube which is immersed in the aquarium tank. When the faucet is turned on, the faucet pump creates a vacuum and gravel is sucked into the gravel tube and there churned and scrubbed allowing the sediment from the tank to be separated and carried up the flexible hose into the drain with the dirty tank water. The tank is then refilled with clean water redirected down through the faucet pump, flexible hose and gravel tube. The faucet pump is unique in that it causes the gravel to be sucked *up* into the gravel tube without being sucked *out* through the flexible hose to the drain.

LAPP's product, the UGV, is very similar, yet contains differences that LAPP contends prevent it from infringing on the '784 patent. The main difference is that the UGV contains a "claw" that is attached to the bottom of the gravel tube. The claw contains teeth with tiny slots that are used to scratch the gravel on the bottom of the tank and release the sediment, which is then swept into the tube through the small slots, up through the gravel tube and flexible hose and out into the drain. According to Plaintiff, the claw prevents any gravel from entering the tube, as the slots are not wide enough to accommodate the size of gravel. Plaintiff's claim of non-infringement is based on this difference in function and design.

Python now moves this Court for summary judgment on their patent infringement counterclaim, and LAPP's equitable estoppel claim. LAPP moves this Court for summary judgment on the patent invalidity, infringement (literal and doctrine of equivalents), and equitable estoppel claims, as well as summary adjudication on the unfair competition and business disparagement counterclaims. The parties additionally requested the Court to conduct a *Markman* hearing construing the claims in the patent, which this Court did during the oral hearing on Friday, January 31, 1997.

## II. DISCUSSION

### A. Standards of Law

#### 1. Markman Hearing

In *Markman v. Westview Instruments, Inc.*, —— U.S. ——, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), the United States Supreme Court held that the interpretation of patent claims is a question of law exclusively within the province of the court. When construing patent claims, a court must consider the claims themselves, the specification, and the prosecution history of the patent. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995). In addition to these sources, a court may also consider extrinsic evidence in order to determine the true meaning of the language employed in the patent. *Id.* at 980. However, if an analysis of the intrinsic evidence (claim language, specification and prosecution history) resolves any ambiguity in a disputed claim term, it is improper for the court to rely on extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir. 1996).

#### 2. Summary Judgment

On a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, the moving party must first establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Summary judgment must be granted if the party responding to the motion fails "to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Although the moving party has the initial burden of demonstrating that summary judgment is proper, that burden may be discharged by pointing out to the court an absence of facts to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2552–53. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact on

such issues, nor must the moving party support its motion with evidence negating the nonmoving party's claim. *United Steelworkers of America, et. al. v. Phelps Dodge, et. al.*, 865 F.2d 1539, 1542 (9th Cir.1989), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The burden then shifts to the nonmoving party to show that summary judgment is not appropriate. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. To make such a showing, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. *Id.* Such evidence need not be in a form admissible at trial to avoid summary judgment. *Id.* When considering whether summary judgment is appropriate, the Court should draw all reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986). The Court should then ask whether evidence has been presented which would allow a reasonable jury to find for the non-moving party. *Id.* at 249–52, 106 S.Ct. at 2510–12. If the Court finds that no reasonable fact-finder could, considering the evidence presented by the non-moving party and the inferences therefrom, find in favor of that party, summary judgment is warranted.

**B. Markman Hearing—Interpreting the Claims**

In order for this Court to render a decision on the pending motions for summary judgment, it must first interpret and construe the patent claims in dispute in this action. In the instant case, the meaning of the term "gravel" as used in the '784 patent and the meaning of claims 1 and 10 of the '784 patent are in dispute. The dispute centers around whether the term gravel includes sand, as Python contends. If Python's contention is correct, then LAPP's product, which has the capability of drawing sand into the gravel tube, could potentially infringe Python's patent under the doctrine of equivalents.[2] Under *Markman v. Westview Instruments Inc.*,

claim interpretation is a question of law; therefore it is the Court's responsibility to determine the meaning of these disputed terms and claims.

**1. The Term "Gravel"**

The meaning of the term "gravel" as it is used throughout the '784 patent claims is critical to determining whether LAPP's product infringes Python's '784 patent. The term gravel is used a total of 204 times throughout the patent. As discussed above, when construing patent claims, the court must consider the claims themselves, the specification, and the prosecution history of the patent. If an analysis of this intrinsic evidence resolves the ambiguity in the disputed claim term, the court should not rely on extrinsic evidence. However, if the term cannot be defined by referring to this intrinsic evidence, the court can refer to extrinsic evidence to aid in its determination of the meaning of the claim terms. The Federal Circuit has noted that prior art documents and dictionaries are more objective types of extrinsic evidence than opinion testimony, "whether by an attorney or artisan in the field of technology to which the patent is directed." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed.Cir.1996).

**a. The Claims**

■ LAPP contends that although the word gravel is used continuously throughout the patent claims and specification, it is never defined. Case law instructs that although an inventor is free to use terms in a manner other than their ordinary meaning, if the special definition of the term is not clearly stated in the patent specification or patent history, the term will be interpreted as having its ordinary and customary meaning. *See Markman*, 52 F.3d at 979; *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1578 (Fed.Cir.) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the

**2.** A detailed discussion of the doctrine of equivalents is provided in the section of this order analyzing the infringement claim.

prosecution history that the inventor used the term with a different meaning.") (citations omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996).

■ Looking to the words of the claims themselves, no express definition of the word gravel is provided. Python contends that when the claims are read in view of the specification of which they are apart, as required by case law, a definition of gravel is found. Column 6, lines 19–22 of the specification reads: "The gravel is sufficiently heavy that it will fall back to the floor of the aquarium while sediment is carried away with the water discharged through the elongated hose." Python contends that this sentence defines the term gravel by reference to its weight. This sentence, however, is a small part of the entire specification that describes in detail the basic function of a preferred embodiment of the claims. In other words, this sentence is merely one part of the complete description of how the claims, read together, function to clean the aquarium tank; it does not define the word gravel. This statement does not say what gravel "is," it says what it "does." A definition, on the other hand, is a "statement of what a thing is." *See Webster's New World Dictionary of the American Language,* Second College Edition, 1984 Simon and Schuster, p. 370. Therefore, Python's attempt to transform the sentence in its specification into a definition of the term gravel fails.

### b. The Specification

The specification may act as a sort of dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Vitronics,* 90 F.3d at 1582. Additionally, the fact that a patent specification emphasizes a limitation from its beginning to its end supports a finding that such limitation is part of the claimed invention. *Gentex Corp. v. Donnelly Corp.,* 69 F.3d 527, 529–30 (Fed.Cir.1995).

As discussed above, the specification does not define the disputed term gravel. Rather the specification repeatedly uses the term to explain the function of the claims and limits the scope of the patent to an invention or device that lifts gravel into the gravel tube,

churns it, and then allows the gravel to fall back into the tank. Once the court defines the term gravel, the scope of the patent will be clear and a device that falls outside the patent's scope will not be considered an infringing device.

### c. Prosecution History

In interpreting the disputed terms, the court may also consider the prosecution history of the patent, which may include representations made by the applicant regarding the scope of the claims. In the instant case, the applicant (Reyneirs) did not, at any time during the prosecution of the patent, assign any special meaning to the term gravel. The term, although it was used throughout the claims and specification, was neither expressly nor impliedly defined in the patent. Since gravel is not otherwise defined by the patent, the assumption would be that the term gravel is to be given the "meaning that it would be given by persons experienced in the field of the invention." *Hoechst,* 78 F.3d at 1578.

### d. Extrinsic Evidence

■ The intrinsic evidence analyzed above does not aid the court in defining the disputed term in the instant patent. What is clear from the above analysis is that the term gravel should be assigned its ordinary and customary meaning in construing the patent at issue. To presumably aid the court in determining the ordinary and customary meaning of the term, the parties submitted numerous dictionary definitions as well as declarations that purport to define the term gravel. Python argues that the definition includes sand. To support its contention, Python submitted the Declaration of Lance Reyneirs, the original holder of the '784 patent. Reyneirs states in his declaration that:

as one skilled in the art of constructing aquariums, I understand the term "gravel" as used in this patent to teach the use of natural aggregate material typically and historically used in lining the bottom of aquariums.... "Gravel" as used in the '784 patent is understood by the great majority of aquarium hobbyists to include aggregate materials ranging in size from coarse sand to pebbles to small chunks of

rock. A typical natural aquarium gravel setup will include aggregate material of varying sized, almost always including coarse sand.

Reyneirs' 2nd Decl., ¶ 37.

Additionally, Python attached the Declaration of Ralph Speice, who has been an active tropical and marine fish aquarium hobbyist for over 50 years, and has served as monthly contributing editor for "Fresh Water and Marine Aquarium" magazine since 1978. Mr. Speice essentially restates the same definition given by Mr. Reyneirs to describe the term gravel. Python also submitted the definition of gravel obtained from the 1991 version of Random House Webster's College Dictionary, which defines gravel as "small stones and pebbles or a mixture of these with sand."

LAPP submitted its own declarations and dictionary definitions [3] that support their position that sand is not included in the definition of gravel. LAPP also cited to the 1996 Annual Book of ASTM (American Society of Testing Materials) Standards, which defines gravel as particles of rock that will pass a 3 inch (75 mm) sieve and be retained on a No. 4 (4.75 mm) U.S. Standard sieve. Sand is defined as particles of rock that will pass a No. 4 (4.75 mm) sieve and be retained on a No. 200 (75 mm) U.S. Standard sieve. Under these Standards, most sand would be able to pass through the 1.33 mm slots in the claw of the accused device and be churned in the gravel tube. In the 1996 Annual Book of ASTM Standards, the scope of the standards are set out as follows:

[These ASTM Standards are part of a] system for classifying mineral and organo-mineral soils for engineering purposes based on laboratory determination of particle size characteristics, liquid limit, and plasticity index and is used throughout the United States and in many other countries when precise classification is required.

Pradel Decl., ¶ 15, Ex. F.[4]

The Federal Circuit has noted that if a court relies on extrinsic evidence:

dictionaries ... are more objective and reliable guides. Unlike expert testimony, these sources are accessible to the public in advance of litigation. They are to be preferred over opinion testimony, whether by an attorney or artisan in the field of technology to which the patent is directed. Indeed, opinion testimony on claim construction should be treated with the utmost caution, for it is no better than opinion testimony on the meaning of statutory terms.

*Vitronics,* 90 F.3d at 1585.

Given the intrinsic and extrinsic evidence in the instant case, this Court adopts the ASTM definitions and construes the term "gravel" as having a minimum particle size of 4.75 mm.

### 2. Claims 1 and 10

Claim 1, an apparatus claim, states:

Apparatus for use in cleaning and refilling an aquarium tank, the apparatus comprising:

an elongated flexible hose having opposite ends,

a gravel tube including an upper end connected to one of the opposite ends of the flexible hose, and a lower end adapted to be immersed in the aquarium tank such that the low end is adjacent to the bottom of the aquarium tank, the gravel tube having a diameter larger than the diameter of the elongated flexible hose, and

means for connecting the other end of the elongated flexible hose to a water

---

3. The dictionary definitions include Webster's New World Dictionary, Third College Edition, which defines gravel as a "loose mixture of pebbles and rock fragments coarser than sand;" The American Heritage College Dictionary, Third Edition, which defines gravel as "an unconsolidated mixture of rock fragments or pebbles;" and Webster's New World Dictionary of American Language, which defines gravel as "a loose mixture of pebbles and rock fragments coarser than sand."

4. Daniel E. Pradel holds a Doctorate Degree in Civil Engineering from the University of Tokyo and a Certificate of Postdoctoral Studies in Geotechnical Engineering from UCLA. Attached to his declaration is a copy of the 1996 Annual Book of ASTM Standards, Volume 4.08. The definitions of gravel and sand are found in section 3.1.1 and 3.1.2, respectively.

source, said means for connecting including means for causing selective and alternative flow of water from the aquarium tank through the gravel tube and the elongated flexible hose to a drain and flow of water from the water source through the elongated flexible hose to the aquarium tank for refilling the aquarium tank, *said means for connecting the other end of the hose to a water source including means for causing sufficient flow of water through the gravel tube, when said means for connecting causes water flow from the aquarium tank to the drain, that gravel adjacent to the bottom of the aquarium tank will be churned in the gravel tube and sediment at the bottom of the tank adjacent the lower end of the gravel tube will be drawn into the gravel tube, separated from the gravel and discharged through the elongated flexible hose to the drain, said flow of water through said gravel tube being insufficient to cause gravel churned in the gravel tube to be pulled into the elongated flexible hose,* said means for connecting the other end of the elongated flexible hose to the water source including a faucet pump adapted to be threaded onto a faucet, the faucet pump including a tube having opposite ends, one end being adapted to be connected to the faucet and an opposite end being adapted to discharge water into a drain, a venturi section intermediate said opposite ends of said tube, said elongated flexible hose being connected to said venturi section of said tube whereby water flow from the faucet through said tube causes water to be drawn through the elongated flexible hose and discharged to the drain. (emphasis added).

Claim 10, a method claim, states:

A method for removing a portion of the water from an aquarium and also removing sediment from the aquarium and stirring gravel at the bottom of the aquarium to remove sediment from the gravel and for replacing the water removed from the aquarium to refill the aquarium, the method compromising the steps of

providing an elongated flexible hose

providing a gravel tube connected to one end of the elongated flexible hose, the gravel tube comprising a hollow cylinder having an upper end connected to the elongated flexible hose and an open lower end,

connecting an opposite end of the elongated flexible hose to a faucet,

placing the lower open end of the gravel tube adjacent the bottom of the aquarium and adjacent the gravel supported at the bottom of the aquarium,

causing a flow of water from the bottom of the aquarium upwardly through the gravel tube and through the hose, *the flow of water through the gravel tube being sufficient to lift **gravel** into the gravel tube and to churn that **gravel** so as to separate sediment from. the **gravel** and to cause sediment at the bottom of the aquarium to be pulled into the gravel tube and into the hose, and the flow of water into the gravel tube being sufficient to cause the **gravel** to be pulled from the gravel tube into the hose*

discharging water drawn into the gravel tube through the elongated flexible hose into a drain, and

causing a flow of fresh water from the faucet through the elongated flexible hose and· through the gravel tube to fill the aquarium, said step of connecting an opposite end of the elongated flexible hose to the faucet including the step of providing a tube having one end connecting to the faucet, an opposite end for discharging water into the drain, and a venturi intermediate said opposite ends, said opposite end of said elongated flexible hose being connected to said tube adjacent said venturi whereby water flow from the faucet through the venturi to the drain causes flow of water from the elongated flexible hose into the tube, and wherein the step of causing flow of water from the bottom of the aquarium upwardly through the gravel tube includes discharging water from the faucet to the drain to cause water flow through the hose from the aquarium to the drain. (emphasis added).

The italicized portions of these claims are in dispute in the instant case. LAPP claims that the proper construction of those claims

is that they claim a device that actually draws gravel up into the gravel tube and churns it. Python on the other hand contends that the claims do not require gravel adjacent to the bottom of the aquarium tank to be actually churned in the gravel tube. According to Python, "[t]he language regarding churning is simply the test to determine whether the device at issue has 'means for causing sufficient flow of water through the gravel tube.'" Python's Opp., 11:4–8.

■ Applying the same *Markman* analysis to claims 1 and 10 that was applied to the term gravel above, the proper construction of the two claims can be obtained solely from an analysis of intrinsic evidence; the claims, the specification and the prosecution history.

### a. The Claims

A careful reading of the language of the claims reveals that the proper construction of the claims is that they describe a device that actually draws gravel up into the gravel tube and churns it. Claim 1 clearly states "that gravel adjacent to the bottom of the aquarium tank *will be churned in the gravel tube*...." Claim 1 additionally explains that the sediment at the bottom of the tank will also be drawn in to the tube, and *"separated from the gravel"* at which time, the gravel that has been *"churned in the gravel tube"* will fall back onto the aquarium floor. This language is clear; the water flow causes gravel and sediment to be sucked into the gravel tube and separated, with the gravel being cleaned and replaced to the tank and the sediment being swept up the tube and out the drain. Although the disputed language in the claims read in isolation might be interpreted as only requiring the flow of water to be "capable" of lifting the gravel into the tube, reading the claim in its entirety makes the correct interpretation clear.

### b. The Specification

The language in the specification further supports the interpretation that the water flow actually lift the gravel into the gravel tube, not just be capable of doing so. The specification emphasizes that an important feature of the claimed invention is that it creates a sufficient flow of water into the gravel tube to draw gravel into the tube, where it is churned and separated from debris attached to it, preventing fish droppings and sediment from being dispersed throughout the aquarium during cleaning.

> The apparatus of the invention ... functions to remove sediment from the gravel and to clean the undergravel filter. As water is pulled from the bottom of the aquarium, the water draws gravel and sediment up into the gravel tube where the gravel is churned and sediment is discharged with the water drained from the tank.

The fact that the gravel is brought into the gravel tube and stripped of its impurities is one of the primary novelties of the claimed invention, and Python cannot now contend that its patent claims do not encompass the notion that the gravel is pulled into the gravel tube by the water flow and there cleaned of the sediment by churning in the tube.

### c. Prosecution History

A review of the prosecution history of the '784 patent additionally supports the above interpretation of Claims 1 and 10. Initially, the patent examiner rejected the patent application based on the fact that all of the claims in the application had been disclosed in the '564 patent issued to *Green, et al.* In other words, the patent was rejected on obviousness grounds. In response to this rejection, additional language containing functional limitations of the claims were added to the patent. The additional language included the phrase "gravel adjacent to the lower end of the gravel tube is pulled up into the gravel tube and churned."

Moreover, Mr. Reyneirs' counsel made the following statements in his argument to the patent examiner:

> The gravel tube is of sufficient diameter that gravel from the bottom of the tank can be churned within the tube to facilitate removal of solid materials from the gravel.

> In operation of the apparatus embodying applicant's invention ... [g]ravel adjacent to the lower end of the gravel tube is pulled up into the gravel tube and churned.

An additional advantage of the applicant's apparatus is that the gravel at the bottom of the tank is thoroughly churned in the gravel tube until it is completely cleaned.

Additionally, Green [et al] does not illustrate the use of a gravel tube structure so as to provide for a churning of the gravel in a gravel tube.

■ Without the limitations expressed above, the Patent Office would have rejected the patent as obvious, as it had done so once already. A patentee who secures claims only by including very specific limiting functional language cannot avoid those limitations by later broadening the claims and invoking the doctrine of equivalents. *See Mark I Marketing Corp., et al. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 289–90 (Fed.Cir.1995) (precluding a patentee from expanding its claims in an infringement suit to include subject matter which it relinquished during prosecution in order to obtain allowance of the claims), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996). Therefore, the prosecution history additionally supports a finding that the '784 patent claims a device that draws gravel into a gravel tube where it is churned, cleaned and released back into the tank. This is the interpretation that this Court adopts.

## C. Motions for Summary Adjudication on the Patent Invalidity Claim

Title 35 of the United States Code § 103(a) provides in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a) (Supp.1996).

A patent is presumed valid, and the burden is on the party asserting invalidity to establish facts supporting a conclusion of invalidity by clear and convincing evidence.

*Intel Corp. v. United States Int'l. Trade Comm'n,* 946 F.2d 821, 834 (Fed.Cir.1991). LAPP challenges the validity of the '784 patent by asserting that the patented claims were obvious in light of the prior art available at the time the patent was issued. Additionally, LAPP claims that the invention was "on sale" more than one year prior to the filing date of the '784 patent application and therefore the "on sale bar" under 35 U.S.C. § 102(b) invalidates the patent. Lastly, LAPP contends that Python failed to comply with Patent Rule 56 by not disclosing material information relating to patentability to the Patent Office during the prosecution of its patent. For the reasons stated below, the Court finds that all of these contentions fail, and that the '784 patent has not been shown to be invalid.

### 1. Obviousness

■ In its amended complaint, LAPP claims that the existence of a hollow tube and flexible hose combination used for siphon suction, along with a separate apparatus known as the "super pump" for use in draining and filling vessels renders the '784 invention obvious. Python contends that the prior art references before the examiner included various water cleaning, filling and draining devices for aquariums and other receptacles, and described "venturi" suction, siphon suction and hand-pump suction. However, no invention or product had ever combined the elements of the '784 patent in the configuration specified in the '784 patent.

■ Obviousness is a legal conclusion premised on factual determinations set out by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966). The test for invalidity due to obviousness involves a four part analysis, examining (1) the scope of the prior art; (2) the level of ordinary skill in the art; (3) the difference between the claimed invention and the prior art; and (4) several secondary considerations, such as the commercial success of the patented invention. *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1574 (Fed.Cir. 1984). Commercial success is an indication of non-obviousness that must be considered

in a patentability analysis. *Graham*, 383 U.S. at 17–18, 86 S.Ct. at 693–94. These four key factors will be examined in turn below.

### a. Scope of Prior Art

■ In order to determine the relevant scope of the prior art, the Federal Circuit has adopted the "problem-solving approach." This approach requires an examination of the "nature of the problem confronting the inventor." *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 620 (Fed. Cir.1985), *cert. dismissed*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *see also Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1572 (Fed.Cir.1984) (courts look to whether the reference deals with a similar problem to the one in which the inventor was involved). Thus, the relevant field of prior art relevant in the instant case includes references which are pertinent to the problem of cleaning aquarium gravel.

The '784 patent claims a combination of physical elements connected, and of a shape that, when the device is properly used the water flow will be sufficient to allow gravel to churn in the gravel tube and not go into the flexible hose. According to Python, all of the separate elements of the device were identified as prior art before the examiner. However, the '784 patent is unique in that it assembled these known elements in such a way that the apparatus will function to effectively remove debris from aquarium gravel and allow for the efficient refilling of water in the aquarium. No product, whether or not before the patent examiner, had ever combined the elements of the '784 patent in the configuration specified in the '784 patent claims.

*Green et al.* (U.S. Patent No. 3,304,564), the principal reference raised by the patent examiner, described an apparatus having three separate hoses extending into the aquarium tank. The function of these hoses is to simultaneously introduce water into the tank as it is being emptied, with a provision for disconnecting the outflow in the event that the level of water displaced fell below a certain level. Cleaning of "submerged surfaces" was to be accomplished by churning of the entire tank and not just a localized portion falling within the radius or immediate range of a gravel tube, as in the '784 patent.

■ The teaching reference *Gavaza* (U.S. Patent No. 1,950,172) discloses a valve for controlling water flow. Prior to allowing the '784 patent, the examiner had argued that the essential elements of directional flow control in the present invention could be understood from the superimposition of the *Gavaza* valve means at critical control points in the Venturi assembly disclosed in *Green et al.* However, neither reference taught or suggested the use of a gravel tube of larger diameter than the connecting hose to be used as a water-flow modulator, as the '784 applicant successfully argued. Thus, within the relevant scope of prior art, which was all before the PTO, there was no finding of obviousness. Further, the patent examiner's decision on validity of the patent over an initial obviousness rejection is entitled to deference by the Court. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.) ("Deference is due the Patent and Trademark Office decision to issue the patent with respect to evidence bearing on validity...."), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

### b. Level of Ordinary Skill in the Art

Part of the test for determining obviousness is for the court to determine the level of ordinary skill in the art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966) (test for determining obviousness is whether the prior art would have suggested to one of ordinary skill in the art that a process could be carried out and would have a reasonable likelihood of success). The '784 invention is a mechanical device utilizing well known, easily understood physical principles. Contrary to LAPP's arguments, however, this does not render it obvious. Neither "simplicity of the invention [n]or its ready understandability by a judge, constitute evidence of obviousness." *Chore–Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 779 n. 2 (Fed.Cir.1983).

In the instant case, the level of ordinary skill in the art is portrayed in the numerous patents cited by the examiner in the '784

patent file. Although the inventors of those patented devices certainly possess the level of skill required to design a simple mechanical device like Python's Clean & Fill product, no inventor had ever assembled the unique configuration of parts described in the '784 patent. Because no patent or product prior to Reyneirs' invention suggested the combination of elements set forth in the '784 patent, it passed an obviousness review by the Patent Office, and similarly survives such review under the Court's analysis.

### c. Difference between the Claimed Invention and the Prior Art

LAPP's obviousness claim is based in part on its allegation that it sold an aquarium cleaning product utilizing a gravel tube siphon device prior to the '784 patent application, which was not made known to the patent examiner. However, the patent examiner was aware of the *Horvath* patent (U.S. Patent No. 3,734,853), which discloses a suction gravel tube that allows gravel to be drawn into the tube. Nonetheless, the '784 patent was issued over the examiner's initial obviousness rejection. The '784 patent does not use a siphon, but rather a venturi valve, which further differentiates the two products.

### d. Commercial Success

The commercial response to an invention, while not determinative, is significant to determinations of obviousness, and is entitled to fair weight. *Graham,* 383 U.S. at 35–36, 86 S.Ct. at 702–03. Python's Clean & Fill product has been a commercial success. Python alleges that sales of the Clean & Fill have increased dramatically since its introduction into the market, until a recent decline in sales allegedly due to the LAPP's introduction of its product. This commercial success, combined with the above analysis of the other obviousness factors supports a finding that the '784 patent was not obvious in light of the prior art in existence at the time Reyneirs obtained the patent.

### 2. On–Sale Bar

 LAPP also claims that sales of the tube and hoses siphon device more than one year prior to the filing date of the '784 patent application constitutes an "on sale bar" under 35 U.S.C. § 102(b). Under this section, "[a] person shall be entitled to a patent unless ... (b) the invention was patented or ... on sale in this country, more than one year prior to the date of the application...." In *UMC Electronics Co. v. United States,* 816 F.2d 647 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), the Federal Circuit articulated a two-part test as to what constitutes "on sale" for purposes of section 102(b). There must be (1) a definite sale or offer to sell; and (2) the subject matter of the sale or offer must have fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art. *Id.* at 656; *see also id.* at 651 ("The complete invention claimed must have been embodied in or obvious in view of the thing offered for sale....").

Although there were aquarium cleaning products on the market more than one year prior to the '784 filing date, none of the products met the claims of the '784 patent. Although LAPP attached copies of advertisements and sales invoices of certain aquarium cleaning devices to its motion, LAPP has not provided evidence of a device on the market before the '784 patent that meets the claims of the patent. Thus, LAPP's on-sale bar claim must fail.

### 3. Patent Rule 56

In its amended complaint, LAPP alleges that:

> the inventor of the '784 patent knew or should have known of the sales of the hollow tube and hose combination by LEE'S and others more than one year prior to the filing date of the '784 patent application and yet failed to bring these facts to the attention of the patent examiner of the '784 patent application as required by Patent Rule 56.

LAPP's complaint alleges inequitable conduct as an additional basis to attack the validity of the '784 patent. Because LAPP did not raise the issue of inequitable conduct in the context of unenforceability of the pat-

ent, the Court will explore the issue only as it relates to the validity of the patent.

The duty to disclose information material to patentability has been codified in 37 C.F.R. § 1.56 (Patent Rule 56). Patent Rule 56 provides that information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) it refutes, or is inconsistent with, a position the applicant takes in (i) opposing an argument of unpatentability relied on by the PTO, or (ii) asserting an argument of patentability.

One who alleges inequitable conduct arising from a failure to disclose prior art must offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO. *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 (Fed.Cir.1987). The ultimate determination of inequitable conduct is committed to the trial judge's discretion. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir. 1988), *cert. denied*, 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

▆▆ In the instant case, the examiner identified prior art which performed the same function as LAPP's siphon device. The elements of that device were disclosed in the *Horvath* patent. A gravel tube similar to the LAPP's tube and hose device was disclosed in the *Hutchinson* Patent (No. 2,956,507). Elevation of gravel into the tube was also disclosed in the *Horvath* patent.[5] Additionally, LAPP's product relies on a siphon, while the '784 patent utilizes a venturi to create water flow up the gravel tube. The disclosure of LAPP's product would have been cumulative and thus Reyneirs was under no

duty to disclose it to the PTO. In sum, LAPP has failed to prove invalidity.

**D. Motions for Summary Judgment on the Declaratory Relief Claim for Non-Infringement Claim and Infringement Counterclaim**

LAPP seeks declaratory relief that its product does not infringe on Python's '784 patent. In order to determine whether LAPP's product infringes, both the doctrine of literal infringement and the doctrine of equivalents must be explored.

**1. Literal Infringement**

Patent infringement occurs when "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States.... during the term of the patent...." 35 U.S.C. § 271(a) (Supp.1996). A patent is infringed if one or more claims of the patent are infringed. *Intervet America, Inc., v. Kee–Vet Lab.*, 887 F.2d 1050, 1055 (Fed.Cir.1989). An infringement analysis requires a comparison of the alleged infringer's product with the claims of the patent, not with the patentee's product. *Id.*

▆▆ Without going into great detail on each of the twelve claims that make up the '784 patent at this point, a fundamental limitation contained in *all* of the claims is the phrase:

> the flow of water through the gravel tube being sufficient to lift gravel into the gravel tube and to churn that gravel so as to separate sediment from the gravel and to cause sediment at the bottom of the aquarium to be pulled into the gravel tube and into the hose, and the flow of water into the gravel tube being insufficient to cause the gravel to be pulled from the gravel tube into the hose.

Applying the Court's definition of the term "gravel" to the claims, it is clear that LAPP's product does not literally infringe the '784

5. *Horvath* discloses an apparatus which uses suction to draw water and impurities out of the gravel at the base of the aquarium through a bent gravel tube, and then deposit the water into a previously installed filter separate from the tank. The *Horvath* patent discloses that gravel may go into the tube when the water flow, created by the suction, is above a certain volume. "when gravel is observed being drawn up ... a natural response is to raise the hand holding the suction arm. This automatically reduces the flow in the lower end to drop the gravel." U.S. Patent No. 3,734,853 (description of the preferred embodiment).

patent. It is undisputed that LAPP's product contains a "claw" at the bottom of the tube that would prevent a certain size particle from entering the tube. The openings on the claw are 1.33 mm wide. Gravel, as defined above, is larger than this (a minimum of 4.75 mm), and therefore could not pass through the claw to be churned in the tube as set out in the '784 patent claims.[6] Therefore, common sense dictates that LAPP's product does not literally infringe the '784 patent.

### 2. Doctrine of Equivalents

Even though an accused product or process does not literally infringe, infringement may be found under the doctrine of equivalents if the differences between the claimed and accused products or processes are insubstantial. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 62 F.3d 1512, 1517 (Fed. Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). The differences between a claimed and accused device are considered insubstantial only when the accused device performs "substantially the same function in substantially the same way to achieve substantially the same result as the claimed device." *Slimfold Manuf. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457 (Fed.Cir.1991). Infringement under the doctrine of equivalents does not attach if the *way* in which the result is achieved is substantially different. *Id. See also Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1569 (Fed.Cir. 1996) (citing *Burr v. Duryee*, 68 U.S. (1 Wall.) 531, 573, 17 L.Ed. 650 (1863)) ("A finding of equivalency just because the same result is achieved is 'a flagrant abuse of the term equivalent.' ").

▆▆▆ Python's '784 patent contains a limitation on the way in which a tank is cleaned and filled. Through the use of a faucet pump and hose, the '784 patent contemplates the gravel being drawn into the tube, cleaned and then dropped back into the tank. LAPP does not dispute that its UGV performs substantially the same function to achieve substantially the same result as the '784 patent. The question is whether the UGV reaches the result in the same "way" as outlined in the '784 patent claims. As discussed above, given the definition of gravel adopted by the Court, the "claw" affixed to the end of the UGV prevents gravel from entering the tube. The UGV cleans the aquarium by the operator pushing the gravel around the bottom of the tank with the end of the claw, dislodging the sediment and impurities from the gravel *outside* of the tube, without any gravel entering the tube. The sediment and impurities are then swept into the tube through the openings in the claw by the flow of water upward through the tube and out to the drain. Although the same result (cleaning the tank) is achieved, no gravel enters the tube and therefore, the result is achieved in a substantially different "way" than that described in the patent and its claims.

Based on this analysis, the Court finds that LAPP's product does not infringe the '784 patent under the doctrine of equivalents, and summary judgment is GRANTED in favor of LAPP on the non-infringement claim and infringement counterclaim.

### E. Motion for Summary Adjudication on the Equitable Estoppel Claim

In its amended complaint, LAPP alleges that the '784 patent is unenforceable as to it under the doctrine of equitable estoppel because Python did not pursue litigation against Tetra, U.S.A., another company using a product similar to the '784 patent. LAPP claims that in June, 1992, Python sent a letter to Tetra advising of its infringement of the '784 patent and demanding that it cease from selling the infringing product. *See* Amended Compl., ¶ 20. Python, however, never took action against Tetra. LAPP claims that it began to manufacture its UGV based in large part on Python's inaction with respect to Tetra. *Id.* ¶¶ 19–24.

▆▆▆ Controlling Federal Circuit authority makes it clear that there must be inaction with respect to the *infringer-in-suit* (in this case, LAPP) in order to create a claim of equitable estoppel. *A.C. Aukerman Co. v.*

---

**6.** Obviously, all but the coarse-grained sand can be sucked into LAPP's gravel tube, but this does not infringe because of the Court's definition of gravel, which excludes any mineral particle smaller than 4.75 mm.

*R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1042 (Fed.Cir.1992); *see also Hottel Corp v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed.Cir. 1987) (citing as a necessary element of equitable estoppel that patentee "had abandoned its claims *against the alleged infringer*") (emphasis added).

 Equitable estoppel as a bar to a claim of patent infringement can be determined on summary judgment. *Aukerman,* 960 F.2d at 1041, 1043. A party asserting equitable estoppel must prove the following elements:

[1] The actor, who usually must have knowledge of the truth, communicates something in a misleading way, either by words, conduct or silence;

[2] The other relies upon that communication; and

[3] The other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*Id.* at 1041.

The first element, that the patentee must have communicated something to the infringer-in-suit in a misleading way was described in *Aukerman* as follows:

The "something" with which this case, as well as the vast majority of equitable estoppel cases in the patent field is concerned, is that *the accused infringer* will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged. The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim *against the alleged infringer....* The alleged infringer also must know or reasonably be able to infer that the patentee has known of the former's activities for some time.

*Aukerman,* 960 F.2d at 1042 (emphasis added) (citations and footnotes omitted).

 In the instant case, as soon as Python learned of LAPP's sale of the UGV, it demanded that LAPP cease its sales. Additionally, as soon as LAPP filed this action for declaratory relief for non-infringement, Python counterclaimed for patent infringement. LAPP is attempting to rely on the relation-

ship and actions between Python and a third party in its claim of equitable estoppel. Python's actions toward or inaction with respect to Tetra do not give rise to a claim on LAPP's behalf. The only alleged communications between LAPP and Python with respect to their products were Python's requests that LAPP discontinue its sale of the UGV because of its alleged infringement of Python's patent.

LAPP bears the burden to prove each of these three elements by a preponderance of the evidence. *See Aukerman,* 960 F.2d at 1046; *Dymo Indus. v. Monarch Marking Sys.,* 474 F.Supp. 412, 417 (N.D.Tex.1979). Elements [1] and [2] are contingent upon the court finding that a misleading communication took place between the patentee and the infringer-in-suit. No such communication occurred in this case. LAPP has thus failed to prove any of the elements of equitable estoppel and has raised no genuine issues of material fact relating to this claim. Therefore, this Court GRANTS Python's motion and DENIES LAPP's motion for summary adjudication on the equitable estoppel claim.

### F. Motion for Summary Adjudication on the Unfair Competition Claims and Business Disparagement Claims

Python's amended counterclaim alleges causes of action for (1) unlawful, unfair and/or fraudulent business practices under § 17200 of the California Business and Professions Code; (2) unfair, deceptive, untrue and/or misleading advertising under § 17200 of the California Business and Professions Code; and (3) unfair competitive practices under the Lanham Act, 15 U.S.C. § 1125(a). Python has additionally brought a cause of action for business disparagement in violation of the Lanham Act, 15 U.S.C. § 1125(a). At the hearing on these motions, the parties orally stipulated that these claims be dismissed. Based on these representations, the Court hereby DISMISSES these causes of action.

### III. CONCLUSION

Based upon the above analysis, the Court hereby DENIES LAPP's motion for sum-

mary adjudication of invalidity; DENIES Python's motion for summary judgment of patent infringement; GRANTS LAPP's motion for summary judgment on their declaratory relief claim of non-infringement, finding no literal infringement or infringement under the doctrine of equivalents; GRANTS Python's motion and DENIES LAPP's motion for summary adjudication on the equitable estoppel claim, finding no equitable estoppel; and DISMISSES Python's counterclaims for unfair competition and business disparagement based on the oral stipulation of the parties at the hearing.

This order having resolved all of the issues in the operative complaint and counterclaim, the Court hereby ORDERS, ADJUDGES and DECREES that a judgment be entered in favor of Plaintiff on its claim for declaratory relief of non-infringement under either literal infringement or the doctrine of equivalents; against Plaintiff on the issue of invalidity; and in favor of counter-claimant on the issue of equitable estoppel, finding counterclaimant not barred by equitable estoppel.

LET JUDGMENT BE ENTERED ACCORDINGLY.