**COINSTAR, INC., Plaintiff,**

v.

**COINBANK AUTOMATED SYSTEMS, INC., Defendant.**

**No. C97–20536 EAI.**

United States District Court,
N.D. California,
San Jose Division.

Jan. 26, 1998.

Matthew D. Powers, Jeffrey R. Davis, Anne M. VanBuskirk, Weil, Gotshal & Manges, LLP, Menlo Park, CA.

Roderick G. Dorman, Thomas J. Daly, Craig A. Gelfound, Christie, Parker & Hale, LLP, Pasadena, CA.

ORDERS (1) GRANTING IN PART AND DENYING IN PART COINBÁNK'S MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT OF ITS CBII MODEL; (2) DENYING COINSTAR'S COUNTER–MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT OF COINBANK'S CBII MODEL; AND (3) GRANTING COINBANK'S MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT OF ITS CBIII MODEL

INFANTE, United States Magistrate Judge.

## I. INTRODUCTION

Defendant CoinBank Automated Systems, Inc., ("CoinBank") has filed two motions for summary judgment, or in the alternative, summary adjudication of the issues, on the grounds that two models of its self-service coin counting machines (CBII and CBIII) do not infringe any claim of U.S. Patent No. 5,564,546 ('546 patent), either literally or under the doctrine of equivalents. Plaintiff Coinstar, Inc. ("Coinstar") opposes both motions, and brings a counter-motion for summary judgment that the CBII does infringe the '546 patent. For the reasons set forth below, the court hereby; (1) GRANTS in part and DENIES in part CoinBank's motion of non-infringement of the '546 patent by

the CBII; (2) DENIES Coinstar's counter motion for summary judgment of infringement of the '546 patent by the CBII model; and (3) GRANTS CoinBank's motion for summary judgment of non-infringement of the '546 patent by CBIII models with solid input trays.[1]

## II. BACKGROUND

Both Coinstar and CoinBank make, sell, lease, repair and maintain free-standing, self-service coin counting machines which are capable of accepting a large number of loose coins from members of the public, sorting and tallying the deposited coins, and dispensing vouchers or credit to the customer for the coins deposited. Coinstar places its machines in retail establishments, while Coin-Bank concentrates its products in banks.

Coinstar is an assignee of U.S. Patent No. 5,564,546, which was issued on October 19, 1996. The '546 patent, entitled "Coin Counter/Sorter and Coupon/Voucher Dispensing Machine and Method," purports to have overcome the problem of accepting and sorting a "plurality" of coins from an untrained user (i.e., a customer). The patent and amendments note that previous devices have relied upon trained personnel to avoid introducing foreign material into coin sorting devices. The previous devices, unlike the method and apparatus covered by the '546 patent, "were not constructed to accommodate a situation in which . . . 'untrained users are likely to empty their personal containers, such as old cans or bottles, directly into the hopper without first inspecting the coins. Thus, lint, tokens, and various other objects will probably accompany the coins into the machine.'" (citing '546 Patent, col.2:45–52) Amendment Under Transitional Provisions of Rule 129 (hereinafter "Amendment"), p. 12. To overcome this technical problem, the patent includes "a method of waste manage-

ment" to separate debris and other foreign materials from valid coins "which is necessary to insure that the machine is not damaged during use." '546 Patent, col. 2:52–54. The waste management system is comprised of two separate and distinct cleaning steps in two separate locations of the machine.

After the coins have been "cleaned," the coins are sorted in a modified, commercial sorter and any nonconforming coins are rejected and returned to the user. The coins are totaled, and the customer receives a voucher for the value of coins deposited.

The '546 patent includes 41 claims.[2] The broadest independent claim of the patent, claim 1, contains a fundamental limitation (emphasized below) that is common to all of the claims of the patent and is the primary point of contention between the parties. Claim 1 reads as follows:

A method for untrained users to obtain a voucher for coins comprising the steps of:

(a) providing a kiosk having first means for discriminating among coin denominations;

(b) receiving, from said untrained user, in a first location of said kiosk, a plurality of coins of arbitrary denominations;

(c) *performing a first step of cleaning said plurality of coins while said coins are in said first location by providing an opening through which debris may pass;*

(d) moving at least some of said coins from said first location to a second location in said kiosk;

(e) *performing a second step of cleaning said coins, different from said first step of cleaning, while said coins are in said second location;*

(f) discriminating in said kiosk, said denominations of coins, using said first means, after said steps of performing a

---

1. Counsel agreed at the hearing on the motions for summary judgment that the CBIII summary judgment motion only pertains to CBIII machines that have a solid input tray, and that CBIII models with perforations on the bottom of the tray are not affected by this motion. Accordingly, any reference to CBIII machines in this order shall encompass only accused models with a solid input tray.

2. The '546 patent has eight independent claims (1, 19, 23, 25, 33, 38, 40, and 41) and 33 dependent claims. Claims 2–18 are dependent from claim 1, claims 20–22 are dependent from claim 19, claim 24 is dependent from claim 23, claims 26–32 are dependent from claim 25, claims 34–37 are dependent from claim 33, and claim 39 is dependent from claim 38.

first step of cleaning and performing a second step of cleaning;

(g) determining the total amount of said coins; and

(h) dispensing, from said kiosk, a voucher in *cash or merchandise for a value* related to said total amount wherein said value is determined only after steps of receiving and determining. (Emphasis added.)[3]

All independent claims encompass the two cleaning steps, either as method or apparatus claims.

It is useful to discuss the '546 patent's preferred embodiment to understand how the device works. In its preferred embodiment, the patent identifies a hopper tray that is perforated on the bottom which allows small foreign objects to fall through the perforations instead of entering the coin sorting machine. Large foreign matter is removed by the user, and when the user is ready to begin using the machine, he or she presses the "go button," lifts the edge of the hopper tray, dumping the coins down into the entrance of the waste management chute. '546 Patent, Col.4:1–4; Col. 5:45–55; Col. 6:5–16. When the "go" button is activated, the coin sorter starts and a fan within the waste management chute is activated. The fan blows light weight debris out of the chute and away from the coin sorter mechanism. The bottom of the chute is a grooved, porous plate which allows liquid to fall through the plate and be collected. Magnetic strips are placed along the entrance and exit of the chute to extract any magnetic tokens. At the end of the chute, the coins are funneled into a commercially available sorter and counter, which accepts mixed coins and is able to detect foreign coins and slugs. '546 Patent, col.2:64–3:10; 4:48–60; 5:51–58.

The CoinBank models accused of infringing the '546 patent, the CBII and CBIII, perform the same function as Coinstar's machines, but with a few differences. The CBII apparently employs a similar hopper-tray device as the '546 patent's preferred embodiment (i.e., a tray with perforations on the

bottom). Once the coins are placed into the tray, the user lifts the tray at one end and the contents are poured into the interior of the machine. Korman Decl. ¶ 12. The coins fall into a conveyer belt that transports the coins to the coin discriminator, which is located toward the back of the machine. Id. at ¶ 16. Some of the CBII and CBIII models may have a "blocker" plate at the end of the conveyer belt which narrows the entrance to the coin sorter. CoinBank's president asserts that this blocker plate has been removed because larger objects would get stuck at the plate and jam the machine, but Plaintiff's counsel declares that she inspected a CBIII machine at CoinBank's facilities in Los Angeles that had a blocker plate at the end of the conveyer belt. Korman Depo., p. 129, 130; Declaration of Anne Van Buskirk. The CBIII, which was introduced after this lawsuit was filed, has the same conveyer belt transport system, but has a solid input tray (i.e., without any perforations, holes, or openings in the bottom). When the end of the tray is lifted to deposit the coins inside the machine, there is a 3/4 to 1 inch opening wherein the coins can slide onto the conveyer belt. Korman Depo., p. 125.

At issue in the underlying motions for summary judgment is whether CoinBank's self-service coin-sorting machines infringe the '546 patent by including the two separate and distinct cleaning steps set forth in (c) and (e) of claim 1, which are also encompassed in all of the independent claims. CoinBank asserts that the CBII does not employ a second cleaning step, and that the CBIII does not contain *any* cleaning steps as set forth in the claims of the patent. Coinstar contends that it is entitled to summary judgment in its favor that the CBII infringes the patent-in-suit, and that disputed issues of material fact preclude a finding of non-infringement by the CBIII under either literal infringement or the doctrine of equivalents.

### III. SUMMARY JUDGMENT STANDARDS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

---

**3.** Both the parties and the court have labeled the various elements of claim 1 alphabetically for

ease in referring to each limitation of the claim.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). However, the moving party has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the court that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quoting Rule 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Evidence that "is merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment. *Id.* at 249–250, 106 S.Ct. at 2511.

Summary judgment cannot be granted where a genuine dispute exists as to any material fact. Rule 56(c), F.R.Civ.P. A "material" fact is one which might affect the outcome of the case under the applicable law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non-moving party. *Id.* In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513. Moreover, "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when] he is ruling on a motion for summary judgment." *Id.*

## IV. REQUEST FOR JUDICIAL NOTICE

CoinBank requests judicial notice pursuant to Rule 201, Fed.R.Evid., of the authenticity of several documents, including copies of U.S. Patent 5,564,546 and U.S. Patent 4,383,540, and copies of documents from the file history of the '546 patent consisting of the Amendment filed on October 5, 1996, and the declaration of Dan Gerrity, filed in support of the '546 patent application.

Judicial notice of matters of public record, including administrative records and procedures, are appropriate pursuant to Rule 201, Federal Rule of Evidence. *Mack v. South Bay Beer Distributors, Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986). Therefore, CoinBank's request for judicial notice is GRANTED.

## V. DISCUSSION

### A. The Law of Patent Infringement

■ Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Determining infringement of a patent requires a two-step analysis. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro. Mechanical Sys.,* 15 F.3d 1573, 1576 (Fed.Cir.1993). Interpreting the scope of claims is a question of law, while comparing the accused product to the properly construed claims is a question of fact. *Mannesmann Demag Corp. v. Engineered Metal Products Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986).

■ In construing a patent, three intrinsic sources are considered: the claims themselves, the specification, and the prosecution history of the patent. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.

1995) (in banc), aff'd, 516 U.S. 1007, 116 S.Ct. 562, 133 L.Ed.2d 487 (1996).[4] The fact that claims are to be interpreted in light of the specification does not mean that everything expressed in the specification must be read into the claims. *Sjolund v. Musland,* 847 F.2d 1573, 1581 (Fed.Cir.1988). Rather, "[t]he specification may act as a sort of dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Lee's Aquarium & Pet Products, Inc. v. Python Pet Products, Inc.,* 951 F.Supp. 1469, 1474 (S.D.Cal.1997), citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). "[U]nless the specification or file history indicates that the inventor intended otherwise, a claim term will be accorded its ordinary and accustomed meaning." *Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1196 (Fed.Cir.1994).

■ "A patent is infringed if one or more claims of the patent are infringed." *Intervet America, Inc. v. Kee–Vet Lab.,* 887 F.2d 1050, 1055 (Fed.Cir.1989). "An infringement analysis requires a comparison with the claims of the patent, not the patentee's product. *Id.*" *Lee's Aquarium, supra,* 951 F.Supp. at 1481. "To literally infringe, the accused device must contain every limitation of the asserted claim." *Maxwell v. J. Baker, Inc.,* 86 F.3d 1098, 1105 (Fed.Cir. 1996), cert. denied, —— U.S. ——, 117 S.Ct. 1244, 137 L.Ed.2d 327, (1997). If the accused device lacks any element of the claim, there is no literal infringement.

■ An accused device that does not literally infringe the patent may still infringe under the doctrine of equivalents. Under the doctrine of equivalents, an accused structure may infringe a patent "if it performs substantially the same function in substantially the same way, and for substantially the same purpose" as set forth in the claims of the patent. *Slimfold Manuf. Co. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1457 (Fed.Cir. 1991). The presence of two of three of the requirements is not sufficient. Thus, performing substantially the same function and achieving substantially the same result is not sufficient unless the result is reached in substantially the same way. *Perkin–Elmer Corp. v. Westinghouse Electric Corp.,* 822 F.2d 1528, 1531 n. 6 (Fed.Cir.1987).

■ In *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997), the U.S. Supreme Court reaffirmed the validity of the doctrine of equivalents, but warned "[t]here can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement." To avoid going beyond the scope of the claims of a patent as allowed by the Patent Office, courts should "not go beyond the substitution of equivalent elements." The court explained:

> Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to *individual elements* of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety. (emphasis added.)

■ Even if the accused product contains elements that are equivalent to each of the claimed elements in the patented invention, the doctrine of prosecution history estoppel prevents a patentee from claiming an interpretation that was surrendered to overcome rejections based upon prior art. As explained in *Townsend Engineering Co. v. Hi-tec Co., Ltd.,* 829 F.2d 1086, 1090 (Fed.Cir. 1987), "Prosecution history estoppel applies both 'to claim amendments to overcome rejections based on prior art, and arguments submitted to obtain the patent.'" (cite omitted). The rationale of prosecution history estoppel is to "preclude a patent owner in an infringement suit from obtaining a construction of a claim that would in effect resurrect subject matter surrendered during the

---

4. If analysis of intrinsic evidence does not resolve an ambiguity as to the disputed claim term, the court may look to extrinsic evidence. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967,

979 (Fed.Cir.1995). In this case, resort to extrinsic evidence is not necessary and neither party has submitted evidence outside of the patent or prosecution history.

course of proceedings in the Patent and Trademark Office," Chisum on Patents, § 18.05, p. 18–152, 18–153.

## B. Construction of the Claims of the '546 Patent

██ The parties agree that claim 1 of the patent requires two separate cleaning steps in two different locations of the machine. CoinBank contends that the term "cleaning" or "cleaning step" means the removal or separation of debris or waste from the coins and from the pathway through which the coins travel to help prevent jamming or damage to the machine. Coinstar contends that cleaning simply means the removal or separation of any non-coin material from the coins.[5]

*"Cleaning"*

As stated above, when interpreting the meaning of the terms in a patent claim, the court looks to the claims themselves, the specification, and the prosecution history of the patent. "Cleaning" is not expressly defined within the claims of the '546 patent. However, the prosecution history contains numerous references to the purpose for the cleaning steps and why the '546 patent's cleaning steps differ from prior art.

The Federal Circuit and its predecessor, the Court of Claims, have emphasized the importance of looking to the file wrapper in interpreting the meaning of the words in a claim. In an often-quoted statement in *Autogiro Company of America v. U.S.*, 384 F.2d 391, 398–399 (Ct.Cl.1967), the Court of Claims explained the purpose of examining the file wrapper in construing the claims of a patent:

> The file wrapper contains the entire record of the proceedings in the Patent Office from the first application papers to the issued patent. Since all express representations of the patent applicant made to induce a patent grant are in the file wrapper, this material provides an accurate

charting of the patent's pre-issuance history. One use of the file wrapper is file wrapper estoppel, which is the application of familiar estoppel principles to Patent Office prosecution and patent infringement litigation. The patent applicant must convince the patent examiner that his invention meets the statutory requirements; otherwise, a patent will not be issued. When the application is rejected, the applicant will insert limitations and restrictions for the purpose of inducing the Patent Office to grant his patent. When the patent is issued, the patentee cannot disclaim these alterations and seek an interpretation that would ignore them. He cannot construe the claims narrowly before the Patent Office and later broadly before the courts. File wrapper estoppel serves two functions in claim interpretation; the applicant's statements not only define terms, but also set the barriers within which the claim's meaning must be kept. These results arise when the file wrapper discloses either what the claim covers or what it does not cover.

In the prosecution history of the patent in suit, the patentee repeatedly emphasized to the examiner that the '546 patent differed from prior art in that it provided a device, that for the first time, could "accommodate the 'various other objects' that are input by untrained users." Amendment, p. 12, 13. The amendment also referred to language in the '546 patent that distinguishes it from prior art, stating prior art devices relied upon "trained personnel to avoid introducing foreign objects into the machine and thus were not constructed to accommodate a situation in which 'untrained users are likely to empty their personal containers, such as old cans or bottles, directly into the hopper without first inspecting the coins. Thus, lint, tokens, and various other objects will probably accompany the coins into the machine.'" The referenced passage then adds "[t]herefore, a method of waste management is necessary to insure that the machine is not

5. In its Points and Authorities in Opposition to the Motion for Summary Judgment, Coinstar seemed to concede that "foreign matter must be removed in a way that prevents jamming or damage to the machine" and that the "prior art did not adequately address this need to remove foreign matter." However, Coinstar retreated from this definition at the hearing on the motions for summary judgment.

damaged during use." The amendment emphasizes that the '546 patent, unlike prior art, has solved the "technical problem" of how to deal with "lint, tokens and other objects that accompany the coins when deposited by untrained users" by disclosing two different cleaning steps in two different areas of the machine. Amendment, p. 14, 17. The amended patent accomplished this asserted distinction of accommodating dirty coins by method and apparatus claims that specify "two steps of cleaning: a step that occurs in the 'first' (coin-receiving) area and a *different* cleaning step that occurs in a second, *different* area." Amendment, p. 17.[6]

The examiner initially rejected the '546 patent, in part because a prior patent (the De Meyer patent) disclosed an apertured pan which removed waste. To overcome this prior art, the patentee emphasized that the two different cleaning steps in two different locations "successfully addressed" the dirty coin problem. Amendment, p. 14.

Coinstar cannot broadly claim that the term "cleaning" is limited to simply the separation or removal of waste from coins, when it represented to the examiner that its cleaning steps went beyond the prior patent's mere removal of wastes and instead "successfully address[ed]" and "accommodate[d]" the deposit of dirty coins from untrained users for the first time.

Therefore, based upon review of the claims, specification, and patent prosecution, the court interprets the term "cleaning" as the separation or removal of foreign matter from the coins in a manner that helps to prevent damage to the machine.

*"First Cleaning Step"*

 The first cleaning step takes place in the first location in which the customer deposits the coins, with claim 1(c) providing a method for *"performing a first step of*

cleaning said plurality of coins while said coins are in said first location by providing an opening through which debris may pass ... "

Coinstar reads step (c) of claim 1 as having two requirements: "(1) a first step of cleaning said plurality of coins while said coins are in said first location; [and] (2) providing an opening in said first location through which debris may pass [along with the coins]." Opposition to CBIII Summary Judgment, p. 6. CoinBank criticizes Coinstar's interpretation of claim 1(c), contending that it ignores the requirement that the debris separated from the coins by the first cleaning step must pass through an opening in said first location.

Coinstar's breakdown of claim 1 broadens the scope of the claim beyond that disclosed in the patent. Coinstar's interpretation does not take into account that the claim specifically requires that debris which has been removed or separated from the coins in the first location must "pass" through an opening in said first location. It is not sufficient, as Coinstar attempts to argue, that there be a separation of debris that remains in the receptacle, as long as additional debris, which has not been cleaned from the coins, accompanies the coins to the second location in the machine.

*"Second Cleaning Step"*

 Unlike the first cleaning step, claim 1 does not limit how cleaning may occur in the second cleaning step, except that it must be different from the first cleaning step in the first location of the machine. Claim 1(e) provides a method for *"performing a second step of cleaning said coins, different from said first step of cleaning, while said coins are in said second location."* Therefore, the only limitations upon the construction of this claim is that (1) separation of liquid or debris must take place while the coins are in the second location of the apparatus but be-

---

6. The original claim 1 did not provide that it was intended for use by untrained users, nor did it include either cleaning step. The original claim provided:

A method comprising the steps of: receiving from a user in a first location a plurality of coins of arbitrary denominations from a user;

sorting said coins into groups, with each group being one of said denominations;

determining a total amount of said coins; and

dispensing a voucher redeemable in cash or merchandise for a value related to said total amount wherein said value is determined only after said steps of receiving and determining. Amendment, p. 1, 2.

fore the coins reach the sorter; (2) separation must occur in a manner that will prevent damage to the machine; and (3) the method of cleaning must be different from the first step of cleaning.[7]

### C. Infringement Analysis

For purpose of its motion for summary judgment that the CBII model does not infringe the '546 Patent, CoinBank concedes that the CBII model does include the first cleaning element of claim 1 of the '546 patent. It does not make this concession for purposes of the cross-motion for summary judgment of infringement, however. CoinBank also admits that the CBII and CBIII contain the same internal conveyer belt design.

### 1. The CBIII Solid Input Tray and the First Cleaning Step

#### a. *Literal Infringement*

■ Based upon Coinstar's interpretation of the first cleaning step, Coinstar contends that since the CBIII has a narrow slot at the end of the input tray that allows smaller debris to pass through the slot, while blocking larger debris from entering the internal conveyer belt, the limitations of claim 1(c) are literally satisfied. CoinBank asserts that the CBIII does not possess the first cleaning step as set forth in claim 1(c) because any debris passing through the aperture continues to travel with the coins and is therefore not separated from the coins. On the other

hand, any debris that is blocked by the aperture remains in the input tray and does not pass through an opening, as required by the 1(c) limitation.

The CBIII does not literally infringe claim 1(c) of the '546 patent under the proper construction of the claim. There is no opening in the solid input tray through which debris separated from the coins may pass. The only debris that "passes through" an opening in the input tray has not been cleaned (i.e., separated or removed) from the coins. Larger objects that cannot pass through the 3/4 to 1 inch opening between the tray and conveyer belt remain in the input tray, and hence, do not pass through any opening as required by the patent.[8]

#### b. *Infringement under the doctrine of equivalents*

■ Coinstar contends that if there is no literal infringement of claim 1 by CoinBank's CBIII, then there is a factual dispute of whether the CBIII infringes under the doctrine of equivalents. Coinstar asserts that the CBIII's solid input tray "performs substantially the same function (removal of debris from the coins) in substantially the same way (providing a location in the first location which separates debris based on size before it reaches the hopper) to achieve substantially the same result (avoiding damage to the machine from such debris.)" Opposition to CBIII Summary Judgment, p. 16:3–8. In

---

7. CoinBank contends that the method of cleaning in the second location must not be performed by a restriction in the flow of coins, arguing that Coinstar expressly disclaimed this method of cleaning in overcoming the examiner's earlier rejection of the patent in suit based on prior art. CoinBank asserts that the De Meyer patent disclosed a mounting plate that restricted the flow of coins from a funnel to a storage hopper, similar to the blocking plate on the CBII and CBIII. In arguing to the examiner that the '546 patent was distinguishable from the De Meyer patent, Coinstar emphasized that the '546 patent had two different cleaning steps in two different locations of the machine. Since De Meyer had a cleaning step in the coin depository (a perforated bottom plate) and a mounting plate that restricted the flow of coins in the second location, CoinBank asserts that a restriction in the flow of coins cannot be claimed as a second cleaning step.

The problem with this contention is that the drawings in the De Meyer patent indicate that the mounting plate "flow restricter" is actually larger than the gap through which the coins slide from the coin depository to the internal funnel (and mounting plate) of the De Meyer device. If the gap through which the coins enter the machine from the coin depository is narrower than the mounting plate, then this restricted path flow could not have performed a "cleaning" function in the De Meyer patent.

8. At the hearing on the motions for summary judgment, Counsel for Coinstar conceded that "if the Court were to interpret the claim, Claim 1, to require that cleaning be performed by debris going through the opening but coins not, I would have to agree, there is no literal infringement." Transcript, p. 39:4–8.

support of this position, Coinstar cites to the deposition of Bruce Korman in which he affirmatively answers that the "aperture through which the material is poured from the tray into the conveyer belt" is "a second place through which materials other than coins can be separated from coins." Korman Depo., p. 176:7–17. Coinstar also asserts that the narrow slot between the tray and conveyer belt through which the coins pass is identical to a narrow slot disclosed in the '546 specification through which the contents of the tray must pass before entering the waste management chute. Coinstar concludes that "[i]t is clear from the diagram alone that matter larger than the slot, although able to enter the top of the tray, will not pass through this slot along with coins and smaller debris to the waste management chute for further cleaning." Coinstar's Opposition to CBIII Summary Judgment, p. 11.

CoinBank contends that "the aperture for dumping coins from the solid input tray has nothing to do with cleaning coins" and that the "triple identity test" of the doctrine of equivalents is not met. CoinBank asserts that the '546 patent "repeatedly teaches that a cleaning step must remove debris from the coins in a manner that does not obstruct the coin path" and that the aperture between the input tray and the conveyer belt, to the extent it blocks larger objects from entering the machine, obstructs the flow of coins into the machine.

In applying the substantiality analysis of the doctrine of equivalents, there is no genuine, disputed material fact that would support Coinstar's burden of showing all three "substantiality" requirements. While the narrowed opening may ultimately function to separate larger debris from the coins and prevent this debris from entering into the coin sorter/counter, there are no facts to support the conclusion that a narrowed aperture which blocks larger objects from accompanying the coins into the hopper operates in substantially the same way or performs substantially the same function as claim 1(c). Claim 1(c) provides that the first step of cleaning takes place *while* the coins are in the first location by providing an *opening* through which debris may pass. The lan-

guage of the patent, the specifications, and common sense suggest that this step enables objects smaller than coins to pass through one (or several) opening(s) in the tray, while larger objects must be physically removed by the user. Additionally, both the specification and the prosecution history require that the cleaning steps function in such a way that dirty coins are "successfully accommodated" and that damage to the machine should be prevented. Unlike the function described by 1(c) where cleaning occurs by debris passing through an opening in the first location, large debris poured into the CBIII's solid input tray will either remain in the tray or potentially block the entrance of the machine until removed by the user.

Additionally, the patent requires that the first cleaning step be different from the second cleaning step. Coinstar contends a second cleaning step is performed in both the CBII and CBIII models by a "blocker plate" which narrows the gap between the conveyer belt and the coin sorter, thus trapping larger objects before they enter the sorter. Even if the narrowed opening between the intake tray and the conveyer belt were considered a "cleaning step" as set forth in claim 1, this cleaning step would not satisfy the requirement that the first and second cleaning steps be different from each other since both methods assertedly clean coins by providing a narrow opening that blocks larger objects while permitting coins and smaller objects to pass.

Therefore, the court finds that CBIII models with solid input trays do not infringe any of the claims of the '546 patent, under either literal infringement or the doctrine of equivalents, since they do not contain an equivalent *first cleaning step which is also encompassed in all of the claims of the patent in suit.*

### 2. The Second Cleaning Step and the CBII Model

In its motion, CoinBank does not contend that the CBII lacks a first cleaning step as set forth in (c) of claim 1, but asserts that both the CBII and CBIII models lack the second cleaning step identified in all of the claims of the patent. Coinstar opposes this motion, and brings a counter motion for

summary judgment, contending that Coin-Bank's president admitted during his deposition that one function of the conveyer belt is to prevent liquids from reaching the coin sorter/counter.

In support of its motion, CoinBank asserts that its accused machines "do not literally infringe the '546 patent because, among other reasons, a second cleaning step is not performed on the coins." Motion for CBII Summary Judgment, p. 19. CoinBank contends that the conveyer belt provides no cleaning function whatsoever, and that "these structures merely serve to guide the coins from the input tray to the coin discriminator." *Id.* at 22.

Coinstar relies upon a deposition excerpt of CoinBank's president, Bruce Korman, to raise an issue of material fact as to the presence of a second cleaning step in the accused devices, and to support its motion for summary judgment of infringement. This deposition testimony is set forth below:

Q. So you found with the model—with the design of the Model II and III Coin-Bank systems, that they effectively take care of any liquid that might be mixed in with the coins?

A. Yes, they do.

Q. Where does that liquid get separated from the coins, would that be the conveyer belt level?

A. You're saying if someone were to pour liquid in the input tray?

Q. Exactly.

A. Yeah, it would end up splashing down through the conveyer and falling into the lower part of the machine.

Q. And thereby not reach the hopper.

A. Generally, yes.

Deposition of Bruce Korman, p. 279:5–20. Coinstar asserts that by this testimony, "Mr. Korman squarely admitted that one function of the CBII conveyer belt was to perform exactly the same cleaning step as one performed by the '546 waste management chute: removal of liquids before they reach the hopper." Opposition to CBII Summary Judgment Motion, p. 5. Coinstar also contends

that the presence of a blocker plate at the end of the conveyer belt also performs a second cleaning step by blocking large foreign material and preventing this debris from entering the hopper.

In its reply, CoinBank contends that the structure of the conveyer belt[9] would cause any liquids accompanying the coins on the conveyer belt to "necessarily end up" in the coin discriminator, and that if Coinstar's argument is accepted by the court, it would "effectively expand Coinstar's limited patent rights to cover virtually all 'coin paths' or transporting means within coin deposit machines simply because they are not watertight." p. 2. CoinBank also asserts that the blocker plate does not clean coins because any large objects captured by the blocker plate would obstruct the flow of coins into the coin discriminator and prevent the machine from operating. *Id.* As for the deposition of Bruce Korman, CoinBank contends that this testimony is "inadmissible" because Mr. Korman responded to a hypothetical question about which he had no personal knowledge. Furthermore, CoinBank asserts that "on at least two occasions, CoinBank's CBII machines were rendered inoperative at customer installation sites due to the introduction of liquids into the machines." *Id.* at 5.

In its sur-reply, Coinstar disputes the question posed to Mr. Korman as a hypothetical, and points out that repair documents show that liquids in the machines have caused maintenance problems. Coinstar also asserts that CoinBank may not create an issue of fact by introducing a declaration which contradicts earlier testimony, and that Mr. Korman is knowledgeable to testify about the handling of liquids since CoinBank has designated him as the individual most knowledgeable about the design, testing, development, prototype, and procurement of the CoinBank machines.

CoinBank's assertion that Mr. Korman's testimony is inadmissible is not supported by the record. First, Mr. Korman has been identified as the person most knowledgeable about the development process, the testing of each accused CB model, and procurement of the devices. Second, CoinBank relies pri-

9. The conveyer belt is surrounded on three sides by short steel walls.

marily upon Mr. Korman's declaration in support of its motions for summary judgment, so presumably he has personal knowledge of the machines at issue. Finally, the question posed to Mr. Korman asked him if he found that the CBII and CBIII models "effectively took care of any liquids" that might accompany the coins into the machine. This question was not purely hypothetical.

Notwithstanding the deposition testimony which indicated that liquids would be separated from the coins at the conveyer belt level, Mr. Korman's declaration in support of the motion for summary judgment will not be disregarded. While generally a party will not be allowed to create an issue of fact by an affidavit contradicting his prior deposition testimony, this rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266–267 (9th Cir.1991). Before the court disregards a later declaration that contradicts earlier deposition testimony, it must make a factual determination that the contradiction was actually a "sham." *Id.*

In this case, Mr. Korman explains that he was "speculating" as to where liquid would travel if the coins and liquid were present in the input tray and poured into the CBII machine, and that he had not previously considered the issue before. In support of his declaration asserting that liquid would not be separated from the conveyer path (other than incidental leakage between the conveyer belt and the walls), Mr. Korman includes photographs to support his analysis. Therefore, given his explanation of the inconsistencies, Mr. Korman's declaration will not be disregarded.

The inconsistent statements do raise a genuine issue of disputed fact of whether the conveyer belt is designed or operates in such a manner to perform a second cleaning step, i.e., the removal or separation of liquid from coins. In construing Mr. Korman's de-

position in the light most favorable to the non-moving party, it could be inferred that the accused devices do in fact perform this second step. Moreover, even if the court's acceptance of Mr. Korman's declaration testimony over his earlier deposition did not encompass the weighing of evidence or choosing from reasonable inferences therefrom, it would be unfair to grant a motion for summary judgment against Coinstar without giving it an opportunity to obtain additional evidence to refute Mr. Korman's change of testimony.

Therefore, since disputed issues of material fact remain as to whether the CBII machine infringes upon the patent in suit, CoinBank's motion for summary judgment is DENIED and Coinstar's counter motion for summary judgment is DENIED.

### 3. Means Plus Function Claims

CoinBank also challenges independent claims 25, 33, 38, and 41, and all dependent claims therefrom, contending that the conveyer belt and blocker plate in the CBII and CBIII models do not infringe these means-plus-function claims. CoinBank contends that to infringe these claims, the accused device must have a fan, a porous surface having grooves for transporting coins, magnetic strips, or the equivalent of one of these structures. In response, Coinstar contends triable issues of fact exist as to whether the conveyer belt, which removes liquids, is equivalent to the '546 waste management chute, which also removes liquids.[10]

The relevant provisions of the independent apparatus claims set forth above contain substantially the same language. The claims provide a "means for performing a second step of cleaning, different from said first step of cleaning, while said coins are in said second location."

 Unlike a method claim, a claim expressed in means plus function language

---

**10.** Coinstar only addresses independent claims 25, 40, and 41 in its opposition. It appears that Coinstar does not contend that independent claims 33 and 38 are infringed by CoinBank's machines. See, e.g., Coinstar's Memorandum in Opposition to CoinBank's Motion for Summary Judgment or Summary Adjudication of Issues (CBII), p. 1 (identifying asserted claims of the '546 patent as **1**, 4, 5, 7, 10, 11, 13, **25**, 28, 29, 31, **40**, and **41**). (emphasis denotes independent claims.)

"shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. As explained in *Valmont Industries, Inc. v. Reinke Mfg. Co., Inc.,* 983 F.2d 1039, 1042 (Fed.Cir.1993):

> In applying the "means plus function" paragraph of § 112, however, the sole question is whether the *single means* in the accused device which performs the function stated in the claim is the *same as or an equivalent* of the corresponding structure described in the patentee's specification as performing that function. *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985). In sum, for a means-plus-function limitation to read on an accused device, the accused device must employ means identical to or *the equivalent* of the structures, material, or acts described in the patent specification. The accused device must *also* perform the identical function as specified in the claims. (emphasis added.)

"The means-plus-function language must not only read on the accused device, but also, if the accused structure is different from that described in the patent, the *patentee* must prove, for literal infringement, that the means in the accused device is *structurally equivalent* to the means described in the specification." (emphasis added.) *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1536 (Fed.Cir.1991) "Section 112(6) means exactly what it says: To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Id.* at 1535.

■ Moreover, "equivalency" under § 112 differs from the meaning of equivalency in the doctrine of equivalents. *Valmont, supra.,* 983 F.2d at 1042. The doctrine of equivalents equitably *expands* patent rights to prevent a copyist from escaping infringement by making insubstantial changes, while § 112, ¶ 6 "*limits* the broad language of means-plus-function limitations in combination claims to equivalents of the structures, materials, or acts in the specification." (emphasis added.) *Id.,* at 1043–1044.

■ It is not sufficient for Coinstar to assert that the conveyer belt performs the same function as the waste management chute disclosed in the specification. Coinstar must also introduce evidence that the conveyer belt itself is structurally equivalent to the corresponding structure in the patent.[11] See, e.g., *Laitram, supra.,* rejecting the patentee's contention that the accused structure and the structure disclosed in the specification were "equivalent" because they performed the same function.

The specification describes the second cleaning step in the second part of the machine as a waste management system in which "[l]iquids fall through the porous, grooved bottom plate of a system while lint and other fine materials are blown away by a small fan located in the chute, Liquids are collected in a waste receptacle. At the end of the system, the coins are funneled into the coin counter and sorter." '546 Patent, 4:48–55. The surface of the waste management plate is a slanted, porous plate which has grooves running lengthwise down the plate. The specification describes the grooves as "forming a series of alternating peaks and valleys." The specification further describes that "[t]he coins ride along the surface of the plate while liquids flow down the valleys, eventually flowing through perforations drilled in the bottom of the valleys. The liquids are then funneled down spout (sic .) and collected. The sharp peaks, combined with a teflon coating, help minimize the friction caused by the liquids which may accompany the coins. This in turn helps prevent a slow down of the process." *Id.* at 7:30–43. Figure 9 in the specification includes a fan that blows air back up the chute towards the entrance of the chute, thus blowing free from the coins small papers and lint. Liquids flow

---

11. Contrary to Coinstar's contention otherwise, it is not CoinBank's burden to offer evidence to support a conclusion that the conveyer belt and blocking plate are not equivalent to the cleaning structures disclosed in the specification. Coinstar has the burden of proof in showing infringement, not CoinBank.

through the holes of the bottom plate, through the spout, and are collected in a separate receptacle. Magnetic strips along the exit and entrance of the chute collect ferrous objects and remove them from the coins. *Id.* at 7:43–54.

The accused structures present in the CBII and CBIII machines—the conveyer belt and the blocker plate—are not identical to any of the structures disclosed in the second cleaning step in the '546 patent. A comparison of the accused conveyer belt and the waste management chute does not demonstrate structural equivalency. The conveyer belt is a horizontal, hard rubber surface with short steel walls which has the primary purpose of transporting the coins to the coin discriminator in the back of the machine. The surface of the conveyer belt is solid (not porous), it is not teflon coated to reduce friction, and there is no receptacle to collect the liquids that happen to seep through the narrow gap between the moving belt and steel walls.

Coinstar has the burden of raising genuine issues of fact that tend to show the conveyer belt and the waste management chute are structurally equivalent. The only evidence Coinstar identifies in responding to Coin-Bank's challenge to the apparatus claims is Mr. Korman's deposition testimony in which he states the conveyer belt effectively takes care of any liquids that might be mixed in with the coins. This testimony may tend to show that the *functions* of the conveyer belt and porous waste management chute are equivalent. However, a showing that the conveyer belt and the porous plate perform *equivalent functions* alone does not address the issue of the equivalency of the two *structures*. See, e.g., *Laitram, supra*.

Therefore, since no genuine issue of material fact exist which tend to show the accused devices in the CBII, i.e., the conveyer belt and the blocker plate, are structurally equivalent to any of the structures in the specifications that perform a second cleaning step, CoinBank's motion for summary adjudication that the accused device does not infringe claims 25, 33, 38, 40, and 41, and the claims dependant therefrom is GRANTED.

## VI. CONCLUSION

For the reasons set forth above, it is HEREBY ORDERED THAT:

(1) CoinBank's motion for summary judgment of non-infringement by the CBII model is GRANTED as to independent apparatus claims 25, 33, 38, 40, and 41, and the claims dependant therefrom, and DENIED as to the remaining independent claim and asserted dependant claims therefrom.

(2) Coinstar's counter motion for summary judgment of infringement by the CBII model is DENIED.

(3) CoinBank's motion for summary judgment of non-infringement under literal infringement or the doctrine of equivalents of CBIII models with solid input trays on the grounds that the CBIII does not perform a first step of cleaning a plurality of coins while the coins are in the input tray, as defined by the claim 1 of the patent, is GRANTED.

IT IS SO ORDERED.